**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM H. SILK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 01425 |
| | ) | |
| BOARD OF TRUSTEES of | ) | Judge John J. Tharp, Jr. |
| MORAINE VALLEY COMMUNITY | ) | |
| COLLEGE, DISTRICT NO. 524 | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William H. Silk, sued his former employer, Moraine Valley Community College, for discrimination based on age and disability as well as retaliation for complaining about discrimination. Silk, who was an adjunct professor at the College for many years, alleges that various decision-makers altered his terms of employment and ultimately terminated him after he took a medical leave to have triple bypass surgery. The College denies that there was any discrimination or retaliation. It now moves for summary judgment, contending that after discovery, Silk has not adduced any evidence that his age or a perceived disability caused the employment actions about which complains, nor any evidence that any action was taken as a result of his two discrimination complaints. For the reasons that follow, the defendant's motion is granted.

**FACTS**

Silk began working at the College, a community college in Chicago's southwestern suburbs, as an adjunct professor in 1986. The College's adjunct faculty members are non-tenure-track, at-will employees. Throughout his employment, Silk was a member of the adjunct faculty

1

bargaining unit represented by a local chapter of Cook County Teachers Union, and covered by a collective bargaining agreement. Typically, Silk taught four classes during the Fall and Spring Semesters, and two or three classes during the summer session.

Walter Fronczek was the Dean of Liberal Arts at the College during the relevant time period. The Dean held ultimate supervisory authority over the faculty in the Department of Liberal Arts. Fronczek was absent during much of the Spring 2010 semester due to health problems. During that time, Lisa Kelsay served as Acting Dean; during the remainder of the relevant time period, she was the Assistant Dean of Liberal Arts. The faculty Chair of the Social Sciences Department (a branch of the Liberal Arts Department) in Spring 2010 was Aileen Donnersberger; when she took sabbatical leave in Fall 2010, Ricky Cobb served as the Interim Chair. Throughout this time period and until June 2012, the president of the College was Dr. Vernon Crawley.

Beginning in 2009, Dean Fronczek instituted a new adjunct faculty evaluation system in the Liberal Arts Department. Before that time, only new adjunct faculty were observed and evaluated by the College; experienced adjunct professors received only student evaluations.

In March of 2010, according to the usual procedures for assigning faculty members to classes, Aileen Donnersberger sent Silk an offer to teach two sociology classes in the upcoming summer term, and Silk responded affirmatively. However, beginning on April 19, Silk took a medical leave of absence and did not return to teach his spring semester classes. Silk had heart bypass surgery on April 21 and was released from the hospital on April 26.

During Silk's absence, Donnersberger and Fronczek went to Silk's spring classes and informed the students that there would be an instructor change. They spoke with the students and reviewed the syllabi for the course. Fronczek testified that the students he spoke to expressed

concern because they had been given only one quiz for a grade during the semester. The attendance at Silk's classes was low compared to the enrollment. Fronczek was concerned about the attendance and about what he believed to be an inadequate syllabus; Donnersberger noted that in one course, the syllabus did not reflect the textbook that was actually used in the class.

As the semester closed, Fronczek was off of work for about two months for a medical issue, during which time Lisa Kelsay assumed his duties. In late April, Donnersberger became concerned about the summer classes she had designated for Silk; Silk was not back from his medical leave, and she needed to cover those courses. In early May, Silk attempted to contact Donnersberger about his summer class assignments; initially, he misdirected his email to another College employee with the same last name. On May 5, Silk spoke to Acting Dean Kelsay and was informed that his two summer classes had been reassigned because the College had no information about how long he would be out of work. Kelsay also told Silk that pursuant to College policy for employees who are hospitalized or on medical leave, a medical release would be required before he could go back to work. She memorialized the conversation in a May 7 email to Fronczek, conveying that she had informed Silk that it was incumbent on him to obtain a medical release before he could be assigned any classes. Silk went to his doctor on May 10 and obtained a medical release. Silk hand-delivered the medical release to the Human Resources Department on May 12, 2010, and Kelsay was informed the same day that the release had been submitted, although she did not receive a copy. On May 17, Silk sent a copy of the release to Donnersberger. However, Silk's classes had already been assigned to other instructors, even though, according to normal practice, the actual teaching contracts often were not executed until classes began or the week before.

Upon his own return from medical leave, Dean Fronczek scheduled a meeting with Silk to "deal with problems in his syllabus." The meeting was held on July 15, 2010, and was attended by Fronczek, Silk, Donnersberger, Cobb, and Silk's union steward, Don Stewart. At the meeting, Silk was advised of deficiencies in his course outline and was directed to make changes. Fronczek perceived Silk as uncooperative during the meeting and was offended by Silk's suggestion that the College's students could not be treated as Harvard students.[1] The day of the meeting Fronczek determined that Silk should be assigned no more than two classes in the fall. Fronczek reduced Silk's course load from four to two out of concern for "the way that the class was being taught." According to Silk, at the same meeting Donnersberger said that "we" assigned him only two classes in the fall because "we didn't think [you] were physically capable of handling them."[2]

Eventually, Silk submitted a syllabus that Fronczek approved. Fronczek and Cobb, the Acting Chair of Sociology, agreed that they would each conduct a classroom observation of Silk during the fall semester. Dean Fronczek observed Silk's Sociology 102-003 class, "Marriage and Family," on October 15, 2010. He entered the classroom late and at one point interrupted Silk's dialog with a student. After observing the class, Fronczek had many criticisms of Silk's classroom performance, such as: over-relying on notes, giving out misinformation, using statistics inappropriately, failing to cite any source material, using slang, and mostly relying on his personal experiences. Fronczek also noted that only 7 of 28 students were in attendance and

---

[1] Fronczek recalls Silk saying that the students were not "Northwestern quality," whereas Silk remembers stating that the percentage of remedial students at the college meant that they could not be treated like Harvard students. At the risk of offending both institutions, the Court does not deem the difference to be material for purposes of summary judgment.

[2] See Silk Dep., Pl. Ex. 15, Dkt.# 19-4 at 63. Donnersberger, on the other hand, testified that at the meeting, there was not any discussion that Silk was not going to be assigned classes because of his physical condition. Donnersberger Dep., Pl. Ex. 19, Dkt. # 19-9 at 84. For purposes of summary judgment, this dispute must be resolved in Silk's favor.

few, if any, were paying attention, taking notes, or participating. After the class, Fronczek discussed Silk's teaching with students who approached him in the hallway outside the classroom. Fronczek was alarmed by the students' complaints about the class, and he gave them his business card. Silk does not contest that this was Fronczek's assessment of his performance, but he disagrees with it.

Cobb conducted an observation of Silk's "Marriage and the Family" course sometime in late October. He discussed his observations with Fronczek afterward, stating that there was low attendance, that the students were not engaged, and that Silk's presentation was disorganized and largely incoherent. Cobb stated that Silk's performance was below the department's standards and "one of the poorest exhibitions of instruction I have witnessed at the collegiate level." Again, Silk does not dispute that this was Cobb's evaluation, but he disagrees with the substance of the comments. Fronczek also requested a written summary of Cobb's assessment, but Cobb did not provide it until four months later (after Silk had filed complaints about the reduction of his teaching load). Silk further points out that neither Fronczek nor Cobb followed the College's written protocols for classroom observation, that he never received written reports of the evaluations, and that he was not given a chance to respond to the evaluations of his performance.

Fronczek decided to fire Silk. On November 17, 2010, Fronczek instructed the Director of Human Resources by email to place Silk on the College's "Do Not Hire" List—the title of which is self-explanatory.[3] On November 18, 2010, he told Silk that there would be no classes "available" for him the following semester or in any following semester. Silk asked for an

---

[3] Silk objects to any testimony about the "Do Not Hire" list because, he says, one was never produced in discovery. The College maintains that did provide a copy of the list, with every name but Silk's redacted. Neither party has submitted the list itself as evidence or relies on it, but there is no dispute that the College maintains such a list (in fact, Silk believes the existence of the list bolsters his claim, *e.g.,* Mem., Dkt. 23 at 3 n.1), and that Dean Fronzcek emailed Harrington on November 17, 2010, instructing her to place Silk's name on the list.

explanation, but, consistent with his practice for at-will employees, Fronczek did not provide reasons.

Silk's union filed a grievance on November 26, 2010, challenging the decision that no classes were "available" for him to teach and claiming that Fronczek's decision constituted "age/health discrimination." The grievance was denied because "non-renewal of employment" was "not grievable" under the union's collective bargaining agreement for employees of Silk's classification.

In the meantime, Silk was still teaching his Fall 2010 courses. In mid-December, a number of Silk's students visited Fronczek complaining about the classes and Silk's grading, and stating that all students had received the same grades and comments on an essay assignment. Fronczek did not advise Silk of the complaints; instead Fronczek reviewed the students' work and adjusted the students' course grades—all upward. Fronczek also encouraged the students to file written complaints.

After being informed that he would not be assigned any sociology classes, Silk approached the College's Dean of Career Programs—which is outside the Liberal Arts Department—for work; he related that Fronczek would not assign him classes in sociology. He ultimately contracted to teach two Criminal Justice courses in the Spring 2011 semester. When Fronczek saw Silk on campus in January 2011, he sent an email to the Human Resources Director to inquire why Silk was teaching despite being on the "do not hire" list. He also contacted the Dean of Career Programs, Peggy Machon, and explained his experience with Silk. Also in January, Silk filed a charge with the EEOC complaining about age and disability discrimination.

The College president, Dr. Crawley, was informed that Silk had been terminated by the College but was now teaching classes in the Criminal Justice Department. Dr. Crawley instructed Dean Machon to observe Silk's classes. On February 1, 2011, Machon attended one of Silk's classes and reported to Crawley that some students left after attendance was taken, that Silk read from the textbook, did not use any instructional aides, and did not interact with the students. Again, Silk was not given a report of the observation or any opportunity to comment. Dr. Crawley instructed Machon to fire Silk, and she sent him a termination letter on February 14, 2011, terminating his employment effective immediately.

Fronczek testified that Silk's age and health had nothing to do with his employment decisions regarding Silk. Silk "admit[s]" that Fronczek so testified. He notes, however, that of the 20 adjunct professors terminated during Dean Fronczek's tenure, 14 of them were over age 40, and Silk was the oldest of them all.

Silk filed this federal lawsuit against the College on February 8, 2012, alleging discrimination based on disability and age and retaliation for complaining about such discrimination. In support of his disability discrimination claim, Silk alleges that the College rescinded two of his Fall 2010 course assignments, then excluded him from further assignments, and ultimately terminated him, "based upon his record of cardiac impairment and perception that plaintiff was an individual with a disability." Compl., Dkt. # 1 ¶¶ 23-26. Silk further alleges that the "rescission of [his] course assignments in the Liberal Arts and Criminal Justice Departments . . . and subsequent termination from employment" were discrimination based upon his age (69). *Id*. ¶ 31. Finally, he contends that the College "retaliated against plaintiff for objecting to the discriminatory actions of defendant in violation of the ADA and ADEA and, effectively, 'black-balled' him for all prospective employment following the filing of his administrative EEO

complaint," *id*. ¶ 37; his later filings makes clear that he also believes the retaliation was for filing the union grievance. The College now moves for summary judgment on all claims.

## DISCUSSION

The Americans with Disabilities Act prohibits discrimination against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA also protects those who are "regarded as" disabled, accurately or not. 42 U.S.C. § 12102(1)[4] (defining "disability" to mean: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment"); *Fleishman v. Continental Cas. Co*., 698 F.3d 598, 606 (7th Cir. 2012).

The ADEA prohibits an employer from discharging an individual over the age of 40 "because of such individual's age." 29 U.S.C. § 623(a)(1); *id*. § 631(a) (limiting protections to those over 40 years old); *Mullin v. Temco Machinery, Inc*., 732 F.3d 772, 776 (7th Cir. 2013). To establish an ADEA violation, the plaintiff must show that his age "actually motivated the adverse employment action" in the sense that it "played a role in the employer's decision-making process and had a determinative influence on the outcome." *Mullin*, 732 F.3d at 776 (citing *Van Antwerp v. City of Peoria, Ill*., 627 F.3d 295, 297 (7th Cir. 2010)).

Summary judgment should be granted when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Andrews v. CBOCS West, Inc*., 743 F.3d 230,

---

[4] The ADA was substantively amended effective January 1, 2009; the amended version, which changed the "regarded as" standard, applies to this case.

234 (7th Cir. 2014). To survive summary judgment in a case like this one, the plaintiff "must offer evidence that allows a reasonable factfinder to infer that his employer discriminated against him because of his age or disability or retaliated against him as a result of his . . . claim" of discrimination. *Teruggi v. The CIT Group/ Capital Finance, Inc*., 709 F.3d 654, 656 (7th Cir. 2013). In making this determination, the Court views all evidence in Silk's favor and gives him the benefit of all reasonable inferences. As to both the ADA and ADEA claims, Silk can prove his case under the direct or the indirect method of proof and rely (under either method) on circumstantial evidence to meet his burden. *Terruggi*, 709 F.3d at 659.

### A.     Discrimination Based on Disability.

The College first contends that Silk has no evidence of a disability, either real or imagined by his employer. Silk, effectively conceding the absence of an actual disability, argues only that the evidence shows that he was "regarded as" disabled. (Why the College would regard as disabled someone who underwent successful surgery and was cleared by a doctor to work, or why it would believe that the prior heart condition would render him physically capable of teaching two but not more classes, are among many questions raised by Silk's arguments that are never answered.) As support, Silk relies on evidence that the College was aware as of early to mid-May 2010 that he was physically fit to teach, and the summer teaching contracts had not yet been finalized and therefore assignments were still subject to change, but he was nevertheless not assigned to teach. From these facts Silk infers that the College *must* have believed him to be disabled.[5] He also points to his own testimony that Donnersberger told him on July 15 that he

---

[5] This circular reasoning—proving that Silk was regarded as disabled by reference to a claimed act of disability discrimination—is problematic, but the defendants focus their arguments elsewhere.  The Court notes, however, that the fact that Silk put the College on notice that he was physically healthy would also permit a reasonable inference that the College believed Silk to be physically healthy.

was assigned two, rather than four, fall classes because she didn't know if he was "physically capable" of teaching them.

The College primarily argues that Silk cannot meet the revised statutory standard of "regarded as disabled" because his impairment was "transitory and minor"—and therefore not subject to the "regarded as" provision of the ADA. 42 U.S.C. § 12102(3)(B) (regarded-as definition "shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less."). By raising the transitory and minor defense, the College takes on the burden of proof and must establish that "the impairment is both 'transitory' and 'minor'"[6]—a question that must be "determined objectively." 29 C.F.R. § 1630.15. "A covered entity may not defeat 'regarded as' coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor." *Id*.

Here, the College has not objectively established that Silk had a minor and transitory impairment. It points solely to the objective evidence that Silk "was hospitalized on April 19, 2010, operated on April 20, 2010, and released for duty by his doctor on April 26 or April 27, 2010." This might suggest that the impairment was "transitory," but the College is wholly silent as to any evidence that it was "minor." The College admits that Silk "needed bypass surgery," Dkt. # 18 ¶ 13, a fact that is indicative of a serious impairment. Certainly the College has not

---

[6] Several cases treat these two statutory requirements in the disjunctive, but that interpretation is at odds with the statutory text and none of the cases offers a rationale for interpreting a conjunctive element as disjunctive. *See, e.g.*, *Scheffler v. Dohman*, 2013 WL 6179381, *4 (D. Minn. Nov. 26, 2013); *Zick v. Waterfront Com'n of New York Harbor*, 2012 WL 4785703, *5 (S.D.N.Y. Oct. 4, 2012); *Fichter v. AMG Resources Corp.*, 2012 WL 3059604, *1 n.1 (W.D. Pa. July 26, 2012).

pointed to any evidence that triple bypass surgery is a remedy for "minor" health concerns (the surgery is a treatment, not the "impairment"). Because all inferences must be drawn in the plaintiff's favor at this stage, the Court will not infer that, as a matter of law, Silk's impairment was minor based solely on the timeframe for the surgery that treated it.

Assuming, then, that Silk was indeed regarded as disabled by his employer, it remains his burden to set forth evidence from which a reasonable factfinder could conclude that the College discriminated against him "because of" that perceived impairment—even after it received a medical release clearing Silk to work. As noted, this may be done through either the direct or indirect methods of proof. Silk does not identify his chosen method, but this is not fatal. The Seventh Circuit has instructed both litigants and courts not to adhere too rigidly to the technicalities of the indirect and direct methods, but to use "flexibility and common sense" and to default to the more straightforward "direct" method unless a plaintiff has elected to carefully follow the burden-shifting approach of *McDonnell Douglas Corp v. Green,* 411 U.S. 791, 802 (1973). *Morgan v. SVT LLC*, 724 F.3d 990, 997 (7th Cir. 2013); *see Perez v. Thorntons, Inc*., 731 F.3d 699, 703 (7th Cir. 2013).

Plainly, Silk has not tried to satisfy the *McDonnell Douglas* test; therefore, the Court must simply evaluate whether Silk has adduced sufficient evidence from which a trier of fact could conclude that the employer acted because of Silk's disability. *See Perez,* 731 F.3d at 703 ("[W]e recognize and join the majority of active judges in this circuit who have opined that the time has come to jettison the 'ossified direct/indirect paradigm' in favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination."); *Morgan*, 731 F.3d at 703.

Although his argument is not particularly clear, Silk apparently rests his case on evidence that on two occasions he was told that his medical condition prevented him from being

considered for teaching assignments. First, he was told about two weeks before the Summer 2012 session that his usual summer course load had been "given away" because Kelsay did not know that Silk was physically capable of returning to work at the time she assigned the courses. Second, Silk says he was advised on July 15, 2010, that his Fall 2010 course load was reduced because, according to Donnersberger, "we didn't think you were physically capable of handling them." These two statements, according to Silk, show that the employment actions at issue were taken as a result of his employer's belief that he was disabled.

In light of the full balance of the evidence, these two instances that Silk cites are not sufficient to permit a reasonable inference that Silk had his teaching hours reduced and was ultimately terminated because of a perceived disability. With respect to his summer classes, Silk does not meaningfully contradict the evidence that he took a medical leave of absence and did not provide the College with a release before the assignments were made. The absence of a timely medical release is a non-discriminatory reason for not assigning Silk summer courses; moreover, he does not dispute that College policy required the release. Silk protests that the assignments were only preliminary in nature at the time he submitted the release because and no summer teaching contracts had been signed, but he does not dispute that "his" classes were offered to other instructors before he submitted the release. Fronczek's cited evidence for his argument that he was viewed as not "physically capable" of teaching in the summer is simply Kelsay's reference to the medical-release requirement (the words "physically capable" are Silk's not Kelsay's words, as best the Court can discern). Silk does not dispute that at time the teaching assignments for Summer 2010 classes were finalized, he was on a medical leave of absence that would terminate only upon his provision of a medical release. The unremarkable administrative requirement that Silk provide a release is not circumstantial evidence of discriminatory intent.

Moreover, Silk's repetitive criticism that, despite the absence of a release to work, the College was in fact on notice that he was "physically capable" of returning to work actually undermines his suggested inference that he was benched because of a perceived disability.

Silk's second piece of evidence of a causal connection—that Donnersberger told him that two of his four Fall 2010 courses were reassigned because he was not physically able to teach,[7] also falls well short of permitting an inference of discrimination based on disability. Silk does not dispute Fronzcek and Donnerberger's testimony that it was Fronczek who decided that Silk should be limited to teaching two classes as part of a plan to improve his course outlines and classroom performance. To the extent that Silk believes Donnersberger was speaking for Fronzcek, his reliance on that evidence is untenable. Donnersberger cannot competently testify as to Fronzcek's state of mind; her statement would be speculation or hearsay as to anyone's intentions but her own, which are not relevant to the decision. Hearsay evidence that would be inadmissible at trial is not competent evidence at the summary judgment stage, either. *See* Fed. R. Civ. P. 56(c); Fed. R. Evid. 802; *Carlisle v. Deere & Co.,* 576 F.3d 649, 655 (7th Cir. 2009) (explaining that to defeat summary judgment, plaintiffs "may rely only on admissible evidence.").[8]

---

[7] There are many reasons to be skeptical of this remark beyond Donnersberger's denial that she said it. For one thing, Silk admits that the decision to reduce his fall classes was made in the summer of 2010 (*see* Mem., Dkt. # 23 at 8)—well after he had provided a medical release—raising the question why his "physical capability" would be subject to debate. And Silk never explains why reducing his course load—not eliminating it—evinces discriminatory motives. Finally, Silk further submits that the College was well aware that he was physically fit to teach, while still attributing to the College a belief that he was "disabled." Silk's story raises many more questions than it answers. Nevertheless, the Court has assumed the truth of Silk's testimony about what Donnersberger said to him, and proceeds on that basis.

[8] Admissibility aside, this single comment, unsupported by any other evidence, is hardly enough to preclude summary judgment where the plaintiff's burden is prove a causal link between the perceived disability and the adverse employment action. To survive summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position

Thus there is no evidence from which it can be inferred that Fronczek—the actual decisionmaker—acted because he perceived Silk to be disabled. Fronzcek testified that Silk's physical condition had nothing to do with the decision and that he wanted Silk to focus on improving his teaching; Silk has no evidence that calls Fronczek's reason into question. Indeed, Fronczek's disregard for Silk's teaching and attitude all but jumps off the pages of his deposition transcript. *See, e.g*., Pl. Ex. 17, Dkt. # 19-9 at 93 ("I would say that my observation of his class left a lot to be desired of a faculty member in a credit college class."); *id*. at 134 ("Bill was incompetent in his grading. Bill did a very poor job of his assessments."); *id*. at 152-53 ("I know our students and for me it was very insulting and it was very unprofessional that a faculty member would feel that way about students in his class. You know, I kind of felt that Bill was there to just collect a check.").

Silk further argues that the non-discriminatory reasons that the College has offered for its decision to reduce his course load and ultimately terminate him are pretext for the discrimination. Supplying pretextual reasons for an adverse employment action can be circumstantial evidence of discrimination under the direct method. *See Terruggi*, 709 F.3d at 660. However, Silk falls well short of establishing that the reasons for the adverse employment actions—first, his failure to submit a medical release in time for the summer 2010 session, and

---

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). A plaintiff proceeding with circumstantial evidence under the direct method must produce sufficient evidence to allow an inference of "discriminatory intent." *See, e.g., Teruggi*, 709 F.3d at 660. The single fact that Donnersberger—not the decisionmaker—said that Silk's course load was reduced because the College "didn't know" what Silk was physically capable of is not sufficient evidence from which a jury reasonably could conclude that the action was discriminatory. It is not part of a "convincing mosaic," *see id*., and it is not sufficient on its own to establish discriminatory intent on the part of the decision-maker. *See, e.g., Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir. 1999) (affirming grant of summary judgment for employer in ADA suit and rejecting physician's single statement that plaintiff "certainly had [the capacity] to do his current job" as insufficient in light of other evidence to create a triable question of fact).

second, his subpar performance—are pretext. In this context, a pretext is a falsehood—not an error, oddity, or oversight. *See id*. at 661. Whether the employer was "hasty or otherwise unwise in its discipline and subsequent termination" of a plaintiff is not for the courts to determine, nor is it the courts' concern that an employer may be wrong about its employee's performance, or may have been too hard on its employee; the only question is whether the employer's proffered reason was a lie. *Gates v. Caterpillar Inc*., 513 F.3d 680, 691 (7th Cir. 2008). Thus viewed, none of Silk's inferences of pretext—see his list at Mem., Dkt. # 23 at 10-11—goes to whether the College is lying about why it took the actions that Silk claims were discriminatory. Instead, Silk lists complaints about how the College went about assigning classes and how Fronczek and Cobb conducted their evaluations of Silk's teaching. These complaints do not point to a discriminatory reason for the College's actions. *See Teruggi*, 709 F.3d at 660 ("amorphous litany of complaints about a myriad of workplace decisions" does not point to discriminatory intent, whether individually or collectively).

At most, Silk demonstrates that various protocols were violated, but there is no evidence that contradicts the record as to whether Cobb and Fronczek believed Silk to be a bad professor. Likewise, although Silk believes there was still time after he submitted his medical release for the College to re-assign to him the summer 2010 courses that had been assigned to other instructors, he does not have evidence that the College "gave away" his classes for any reason other than the absence of release when needed; nor does he explain why the College was obligated to strip another instructor of courses he or she had agreed to teach in order to accommodate Silk's timeline. Silk's pretext arguments all go to whether the College's reasons were sound, not whether they were lies. Even if he could show pretext, however, he would not survive summary judgment. Under the direct method, he must have evidence that allows a jury to

infer "more than pretext; it must itself show that decision maker acted because of the prohibited animus." *Teruggi*, 709 F.3d at 661. All Silk has, in the end, is a litany of complaints about how his employer treated him, none of it relevant or sufficient enough, alone or in combination, to permit a reasonable inference of discrimination based upon disability. *See id*.

**B.    Discrimination Based on Age**

Silk next argues that his course reduction and termination were the product of age discrimination. To establish a violation of the ADEA, "an employee must show that age actually motivated the adverse employment action." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010). To constitute age discrimination, age "must have played a role in the employer's decision-making process and [have] had a determinative influence on the outcome." *Id*.

Plaintiff devotes all of a page of his brief to his ADEA claim, and again, he does not identify any particular method of proof, so the Court will simply evaluate whether he has garnered sufficient evidence from which a trier of fact could reasonably conclude that Silk's age had a "determinative influence" on his course reduction or termination.

Here, the only evidence that Silk submits in support of the age discrimination claim is (1) the fact that, at 69, he was "arguably one of the most senior members of the Liberal Arts Department";  (2) the union steward's statement that he had "noticed" that only one of six people fired by Dean Fronczek in the past few years was under 40; and (3) the College's admission that 14 of 20 adjunct professors terminated from the Sociology and Criminal Justice Departments from 2006 to 2011 were over age 40. *See* Mem., Dkt. # 23 at 13-14. The first fact has no significance other than to establish that Silk is entitled to ADEA protection; whether he was 41

or 81 is not relevant absent some evidence that his "*most* senior" status had any significance for the College.[9]

The second fact is also not evidence of a discriminatory motive. The union representative's unscientific observations regarding the six fired employees are not placed in any context and do not purport to be the actual termination statistics. What the steward "noticed" is not competent evidence of the ages of the employees terminated by Dean Fronczek, nor is there any meaningful inference that can be drawn from the statement even if it is true. The small sample is limited to employees whose terminations the steward knew about; the Court is given no reason to believe he has comprehensive knowledge of the identities and ages of every "person" fired by Dean Fronczek. Similarly, the third fact—the 14-out-of-20 statistic—is meaningless; for one thing, the plaintiff fails to state what percentage of adjunct professors *overall* were over the age of 40.  It might be that seventy percent or more of adjunct professors who were *not* fired are over the age of 40; indeed, the College set forth evidence that many adjunct professors teach as a second career or a means of earning post-retirement income.  In any event, the Seventh Circuit has explained: "Our court generally has not found that statistical evidence concerning terminated employees, without more, is relevant to our analysis of whether the articulated reasons for discharging this plaintiff were pretextual or discriminatory." *Adreani v. First Colonial Bankshares Corp*., 154 F.3d 389, 400 (7th Cir. 1998); *see also Fleishman*, 698 F.3d at 606 (argument regarding purported "pattern" of age discrimination lacked merit where there was nothing to connect ten other employees' departures to the employer's prohibited conduct). This is not the case in which to deviate from that the general principle; the weak statistical evidence on which Silk relies does not tend to prove that the decision to fire *him* was

---

[9] Indeed, that Silk worked at the College beyond the age of any other adjunct professor that the College terminated could be argued to undermine his age discrimination claim.

motivated by his age. Moreover, the primary decisionmaker, Fronczek, testified that age played no role in his decision; Silk has no evidence that gives lie to this statement.

In short, the record is entirely devoid of evidence from which a jury could reasonably infer that Silk's age, was the "determinative factor" in factor in the decisions to reduce his courseload and terminate his employment. *See Van Antwerp*, 626 F.3d at 298-99. Therefore, the College is entitled to summary judgment on the age-discrimination claim.

**C.      Retaliation**

Finally, Silk claims that he was fired because he filed a grievance and then an administrative charge complaining about "medical" and age discrimination. The ADA protects employees from being retaliated against for asserting their ADA rights, even if the underlying claim of discrimination is meritless. 42 U.S.C. § 12203(a); *Povey*, 697 F.3d at 624. The ADEA similarly outlaws retaliation to the extent that it is a but-for cause of a materially adverse employment action. 29 U.S.C. § 623(d); *Barton v. Zimmer, Inc*., 662 F.3d 448, 455 (7th Cir. 2011). Again, the plaintiff may prove his case through the direct or indirect method; under the former, a jury must be able to reasonably conclude that the protected activity and the adverse employment action are causally connected. *See Povey,* 697 F.3d at 624 (direct method requires "causal connection"). As for the indirect method, "the adaptation of *McDonnell Douglas* to the retaliation context [] requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." *Stone v. Indianapolis Public Util. Div*., 281 F.3d 640, 644 (7th Cir. 2002) (abolishing "causal link" requirement under indirect method); *see Alexander  v. Casino Queen Inc*., 739 F.3d 972, 983 (7th Cir. 2014) ("[P]laintiffs must show that they "(1) engaged in a statutorily protected activity; (2) met their

employer's legitimate expectations; (3) suffered an adverse employment action; and (4) were treated less favorably than similarly situated employees who did not engage in statutorily protected activity.").

Clearly, Silk is not invoking the indirect method: he does not argue that he was meeting his employer's expectations—and all the record evidence is to the contrary—or to identify any similarly situated employees who were treated more favorably than he. He therefore must use the direct method and produce some evidence of a "causal connection" between his grievance and his termination. Silk does not purport to have any evidence akin to a direct admission that the College was firing him for his filing of a grievance, so he must produce circumstantial evidence of a retaliatory motive, such as: (1) suspicious timing, ambiguous statements, oral or written, and other "bits and pieces" from which an inference of retaliatory intent might be drawn; (2) evidence that similarly situated employees were treated differently; and (3) evidence that the employer offered a pretextual reason for the adverse employment action. *Lambert v. Peri Formworks Systems, Inc*., 723 F.3d 863, 869 (7th Cir. 2013) (citation and quotation marks omitted).

The College argues that Silk cannot prove any causal connection because the adverse actions he complains of occurred before he raised any discrimination claim for the first time in his union grievance on November 26, 2010. It is undisputed that Fronczek decided not to retain Silk and had him placed on the "Do Not Hire" list on November 17, 2010, and that it was only as a result of an "administrative oversight" that he was hired by a different department before the mistake was discovered and remedied by his termination in February 2011. Because the course load reductions and effective termination preceded the grievance filing, the College contends that there was no retaliation as a matter of law.

The argument is well-taken. Silk does not respond to the defendant's arguments regarding the timing of the adverse employment actions relative to his grievance; he simply proceeds as if the facts were otherwise. But he produces no evidence that contradicts the timeline that the defendants have established with competent proof. If, as the undisputed evidence shows, the decision to terminate Silk and place him on the "do not hire" list was made by November 17, 2010, then he cannot establish a causal link between this action and his later protected activity. The grievance itself states that it related to Silk's "discharge / discipline"—acts that obviously preceded the filing of the grievance.

As for the EEOC charge, which was filed in January 2011, it was addressed toward the same allegedly discriminatory event as the grievance: "I am no longer being assigned classes in the Liberal Arts Department." Pl. Ex. 13. The alleged retaliation that occurred afterward was the issuance of the termination letter on February 14.

However, the only evidence of a retaliatory motive is the close temporal proximity between the charge and the termination. Although "suspicious timing" can indeed be circumstantial evidence of retaliation, in this case, the timing is not suspicious because the College's intent was that Silk's termination would be effectuated months earlier by not assigning him any classes and putting him on the "Do Not Hire" list going forward. The record shows that the College would have taken the very same action against Silk—and indeed, attempted to— irrespective of the EEOC charge. The (second) termination cannot reasonably be viewed as retaliatory under those circumstances. In any case, Silk does not bother differentiating between his two protected complaints. The retaliation section of Silk's brief points only to the fact that the allegedly retaliatory acts occurred "subsequent to" his grievance and EEOC charge. *See* Mem., Dkt. # 23 at 12-13. That is not true as to the grievance, and as to the termination, it is barely

evidence of retaliatory motive for the reasons already discussed; in itself, the timing is not enough to warrant submission to a jury. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (explaining that even suspicious timing rarely is sufficient in isolation to support a case of illegal retaliation).

Silk also argues that the College's reason for firing him is pretextual and therefore indicative of a retaliatory motive. But, as with his discrimination claim, Silk fails to show that the College's reason for firing Silk and "blackballing" him from future employment there—his poor performance—was a pretext for retaliation. Indeed, although Silk devotes a substantial portion of his brief to criticizing the processes used to evaluate his teaching, he never contends with the College's ultimate conclusion that he was a poor instructor. He has certainly not shown that any relevant decisionmaker lied about this being the reason for terminating him. In fact, Silk admitted that Fronczek thought Silk was terrible instructor; Silk disagrees with that assessment, but he has no evidence that Fronczek did not genuinely believe it. The College's reliance on that conclusion is a "pretext" only if it was not the real reason. *See Argyropoulos*, 539 F.3d at 736 ("Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action."). Silk has adduced no evidence of that. Therefore, the alleged pretext does not serve as circumstantial evidence of a causal connection between the grievance and Silk's termination. The facts that Silk points to are simply insufficient to establish a nexus between his termination and any protected activity. *See Povey*, 697 F. 3d at 625.

For all of these reasons, the motion for summary judgment is granted.

Date: May 30, 2014

John J. Tharp, Jr.
United States District Judge